UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MICHAEL URBAN,

    Plaintiff,

v.                                            Case No: 8:21-cv-0733-KKM-AEP

C2 EDUCATIONAL SYSTEMS, INC.,

    Defendant.
_____

## ORDER

Plaintiff Michael Urban alleges that C2 Educational Systems, Inc., terminated his employment in violation of federal and Florida employment law. C2 now moves for summary judgment. Because Urban fails to establish the essential elements of his claims and to rebut C2's neutral reason for his termination, C2 is entitled to summary judgment.

I.     UNDISPUTED FACTS

C2 provides academic tutoring, standardized test preparation, and college admissions counseling services nationwide. (Doc. 41 at 2.) C2 initially hired Urban in July 2014 as an independent contractor. (Doc. 39-1 at 22.) Two years later, C2 brought him on as a full-time employee to work as the Vice President of Informational Technology and

1

Development Services. (*Id.*) In this role, Urban was a member of C2's executive leadership team. (*Id.*)

When he became an employee, C2 sent Urban a link to access the company's digital employee handbook. (*Id.* at 44.) Urban continued to receive links to the employee handbook whenever the handbook updated. (*Id.* at 44–45.) On January 16, 2018, and on September 5, 2019, Urban signed and returned a handbook acknowledgement form, which stated that it was Urban's "responsibility to read and familiarize [him]self with" all the information in the handbook. (*Id.* at 44–45, 271–72; Doc. 40 at 3.)

The handbook includes a non-harassment policy that prohibits behaviors C2 considers to be harassment. (Doc. 39-1 at 276–77.) The handbook directs employees who believe they are victims of harassment to "promptly" inform C2. (*Id.* at 275.) Additionally, the handbook contains a social media policy, which states that "C2's social media policy also applies to off-duty personal use of social media when the employee . . . identifies himself/herself as a C2 employee" either generally or explicitly. (*Id.* at 293–96.) After receiving the handbook, Urban did not review his Facebook account to verify whether his account showed C2 as his employer. (*Id.* at 66–68.) Urban's personal Facebook profile listed him as "VP Information Tech & Dev Svcs at C2" next to C2's logo and this information was visible to his Facebook friends—at least ten of whom were C2 employees—and to the public. (*Id.* at 58–59, 85, 297; Doc. 39-3 at 39–40, 63.)

The handbook also contains a Family and Medical Leave Act (FMLA) policy. (Doc. 39-1 at 283.) The FMLA policy states that "[i]f FMLA applies or believed to possibly apply, the employee will be required, thereafter, to contact Human Resources at hr@c2educate.com to complete a request for leave. The employee will be required to fill out prescribed forms requesting leave and return them in a timely manner as instructed." (*Id.* at 287.) On January 16, 2018, Urban returned a signed form acknowledging that he "received, read, and underst[ood]" C2's FMLA policy. (*Id.* at 273.) Throughout Urban's employment, he routinely used the human resources email identified in the FMLA policy to ask questions about benefits or general employee information. (*Id.* at 51–52.)

In early March 2020, Urban verbally informed Andrew Lobo, C2's Chief Human Resources Officer, that he had scheduled a surgical procedure on March 11, 2020, meaning he would be temporarily out of the office. (*Id.* at 138–39, 142–43.) During this conversation, Lobo did not advise Urban of his FMLA rights, and for his part, Urban neither filed paperwork requesting FMLA leave in connection with his medical procedure on March 11, 2020, nor submitted an email request for FMLA leave in connection with his medical procedure. (Doc. 39-1 at 54, 139; Doc. 39-2 at 10–12.) Urban planned to return to work on April 10, 2020. (Doc. 39-1 at 140.)

Following the March 11 medical procedure, Urban returned to work in the same position at C2. (*Id.* at 145, 159–60.) During the requested time-off period from March 11

3

to April 10, 2020, Urban did not lose any accrued benefits, including vacation, paid time-off, sick leave, or health insurance. (*Id.* at 146, Doc. 39-9.) Further, C2 compensated Urban in full at his regular pay rate during his entire absence from work for medical treatment. (Doc. 39-9.)

Urban continued to receive his regular compensation and benefits until, because of COVID-19, C2 implemented a temporary pay reduction for all its executive team members. (Doc. 39-1 at 82, 146, 153.) C2 also held multiple rounds of furloughs in 2020. On May 12, 2020, C2 furloughed Urban during the second round of the company's furloughs. (*Id.* at 160–62.)

During his employment with C2, Urban used his Facebook account to post content. (*Id.* at 60.) He often reposted a variety of images with captions or words that he took from other sources. (*Id.* at 298–305.) One example included a picture of Colin Kaepernick on a football field with text over the image stating, "[i] only wear silk panties[.] Cotton ones remind me of slavery." (*Id.* at 301.) Another post was a picture of a statute of former President Barak Obama and a child with a heading stating, "[t]his offends me and I'm sure I speak for millions. Can we tear this shit down?" (*Id.* at 299.)

C2 determined that eight of Urban's posts violated its non-harassment and social media policies after it received reports from employees who were either Facebook friends with Urban or found the posts offensive. (*Id.*; Doc. 39-2 at 32–34, 41; Doc. 39-7 at 31,

4

39–40; Doc. 39-13.) One post specifically depicted a fishing line tied in the shape of a noose with a caption reading, "I was gonna go fishing this evening but I opened my tackle box and found this. Somebody's put this in there and I don't think it's funny at all." (Doc. 39-1 at 300.) Urban made this post around the time the perception of a noose in Bubba Wallace's NASCAR stall made national news. (*Id.* at 102.) Julia Longina, one of Urban's Facebook friends and a fellow C2 employee, saw this post on her Facebook feed and found the post offensive, correlating the post to the historical context of nooses as a symbol of slavery and killing people. (Doc. 39-1 at 300; Doc. 39-7 at 28–29, 33, 35.) Longino followed C2's harassment-reporting procedure by notifying her direct supervisor after she saw the post. (Doc. 39-7 at 14; Doc. 39-11.)

On July 1, 2020, C2 terminated Urban's employment. (Doc. 39-1 at 180, 345.) C2 stated Urban's Facebook posts violated C2's non-harassment and social media polices, and thus, were grounds for termination. (*Id.* at 345.)

Following his termination, Urban filed this action alleging that C2 wrongfully terminated him in violation of the FMLA and the Florida Civil Rights Act (FCRA). (Doc. 1.) C2 moves for summary judgment on all of Urban's claims. (Doc. 41.)

## II.  LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a). A

5

fact is material if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant always bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate an absence of a genuine issue of material fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). When that burden is met, the burden shifts to the nonmovant to demonstrate that there is a genuine issue of material fact, which precludes summary judgment. *Id.* The nonmoving party must go beyond the pleadings and point to evidence in the record that demonstrates the existence of a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotation omitted). A moving party is entitled to summary judgment when the nonmoving party "fail[s] to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Id.* at 323.

The Court reviews the record evidence as identified by the parties and draws all legitimate inferences in the nonmoving party's favor. *See Dareing v. Bank of Am. Corp.*, 705 F. App'x 882, 885 (11th Cir. 2017); *see also Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020). Here, to the extent the record is disputed or capable of multiple inferences, the Court draws them in favor of Urban, the nonmovant.

III. ANALYSIS

Urban alleges that C2's decision to terminate him constituted FMLA interference (Count I), FMLA retaliation (Count II), and disability discrimination under the FCRA (Count III). As explained below, each count fails.

A. The Interference Claim Fails Because Urban Did Not Suffer Damages

To establish an FMLA interference claim, an employee must "demonstrate by a preponderance of the evidence that [he] was entitled to an FMLA benefit that was denied." *Batson v. Salvation Army*, 897 F.3d 1320, 1331 (11th Cir. 2018). The employee must also "show harm from the alleged interference with [his] rights." *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1274–75 (11th Cir. 2020) (citation omitted).

"[A]n employee requesting FMLA leave need not expressly mention the Act;" however, "[he] must provide notice sufficient to make the employer aware of both the need for qualifying leave and its anticipated timing and duration." *Crawford v. City of Tampa*, 464 F. App'x 856, 858 (11th Cir. 2012) (per curiam) (citing 29 C.F.R. §§ 825.301(b) and 825.302(c)). To provide sufficient notice, the employee must inform the employer of a potentially FMLA-qualifying reason of absence. *See id.*; *Cruz v. Publix Super Mkts., Inc.*, 428 F.3d 1379, 1386 (11th Cir. 2005). Once an employee provides sufficient notice, "the employer must then ascertain whether the employee's absence actually qualifies for FMLA

7

protection." *Crawford*, 464 F. App'x at 858; *see* § 825.302(c) ("[V]erbal notice [is] sufficient to make the employer aware that the employee needs FMLA–qualifying leave.").

As an initial matter, Urban provided sufficient notice to make C2 aware that he needed FMLA leave. Urban discussed his upcoming surgery with Lobo and informed Lobo that Urban "would need to be away from work from approximately March 10, 2020, to April 10, 2020." (Doc. 39-1 at 139, 143; Doc. 39-2 at 9–10.) Although Urban did not immediately disclose to Lobo that he had prostate cancer, (Doc. 39-2 at 23), the fact that he told Lobo about the upcoming surgery and the "anticipated timing and duration of the leave" provided sufficient notice to "make [C2] aware that [Urban] need[ed] FMLA-qualifying leave." § 825.302(c). Thus, once Urban provided notice, C2 needed to "ascertain whether [Urban's] absence actually qualifie[d] for FMLA protection." *Crawford*, 464 F. App'x at 858. But C2 failed to do so and "didn't charge someone with advising [Urban] of his FMLA rights." (Doc. 39-2 at 10.) Although Urban failed to "comply" with C2's "usual and customary" requirements for requesting FMLA leave because he never emailed human resources, *Crawford*, 464 F. App'x at 858–59 (quoting 29 C.F.R. § 825.302(d)), the plain language of § 825.302(c) clearly indicates that Urban provided sufficient notice to C2 to qualify for FMLA leave.

But to succeed on his FMLA interference claim, Urban must also "show harm from the alleged interference with [his] rights." *Munoz*, 981 F.3d at 1274–75 (citation omitted).

8

Put differently, he must show that the employer's acts amounted to more than "technical infractions." *Id.* (quotation omitted). "[E]ven where there may have been technical violations of the FMLA, those violations are not compensable where . . . a plaintiff has failed to demonstrate that he suffered any 'adverse employment action.'" *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006) (quotations omitted). Thus, an employer's "failure to comply with the procedural requirements of the FMLA is not actionable 'in the absence of damages.'" *Rodriguez v. Sch Bd. of Hillsborough Cty. Fla.*, 60 F. Supp. 3d 1273, 1280 (M.D. Fla. 2014) (Whittemore, J.) (citation omitted) (granting summary judgment because although the employer did not comply with the notice requirements of the FMLA, the plaintiff could not show she was denied any benefits).

Urban has not done so. Urban's pay records indicate that C2 granted Urban paid leave at his regular wage rate throughout his absence for medical treatment. (Doc. 39-9.) It is undisputed that Urban did not lose any accrued benefits, including vacation, paid time-off, sick leave, or health insurance, during the period he requested off from work. (Doc. 39-1 at 146; Doc. 39-9.) Following his return to work after his surgery, Urban continued to receive his regular compensation and benefits until, due to COVID-19, C2 implemented a temporary pay reduction for all its executive team members. (Doc. 39-1 at 82, 146, 153.)

9

Urban argues he was damaged because he was "coerced to cut short his medical leave" before finishing his post-surgery recovery and that this caused complications for him. (Doc. 42 at 14.) Yet Urban's own testimony belies this contention. During his deposition, Urban testified that his bladder complications occurred "during [his] surgery" and that he "c[ould]n't say . . . definitively" that any post-surgical issues occurred due to any alleged work during his recovery period. (Doc. 39-1 at 141, 188.) The parties dispute whether C2 coerced Urban to come back to work during his medical leave or whether he voluntarily returned. (Doc. 42 at 3–4; Doc. 45 at 4.) But even accepting Urban's version of events, he points to no evidence in the record, such as testimony from a doctor or healthcare provider, that links his post-surgery complications to his early return to work. To support his argument, Urban cites to a single, vague statement from an affidavit that he executed the same day he filed his summary judgment response, where he asserts that his early return to work "adversely affected" his recovery, left "side effects" from the surgery medically unaddressed, and caused him to "forego medical treatment." (Doc. 43-1 at 3.) But Urban cannot create a genuine issue of material fact with "an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657(11th Cir. 1984); *see also Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (concrete facts rather than conclusory allegations and assertions are required to defeat a summary judgment motion). And

Urban's "failure to cite to evidence in support of damages" beyond a vague statement in his affidavit is a proper "basis for entering summary judgment" because it would leave a jury without guidance as to the nature and extent of his injuries. *HRCC, Ltd. v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017); *see also Dolphin LLC v. WCI Cmtys., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013) (per curiam) (holding a plaintiff must provide evidence of damages to survive summary judgment).

Accordingly, C2 is entitled to summary judgment on Urban's FMLA interference claim.

### B. The FMLA Retaliation Claim Fails Because Urban Cannot Rebut C2's Neutral Reason for His Termination

To establish a prima facie case for FMLA retaliation, an employee must show that "(1) [he] engaged in statutorily protected conduct, (2) [he] suffered an adverse employment action, and (3) there is a casual link between the protected conduct and the adverse employment action." *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000). A claim for FMLA retaliation is evaluated under the *McDonnell Douglas* burden-shifting framework. *See id.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, the plaintiff must establish a prima facie case for retaliation. *See Martin v. Brevard Cty. Public Schools*, 543 F.3d 1261, 1268 (11th Cir. 2008). If the plaintiff does so, the burden shifts to the employer to provide a legitimate reason that the

11

asserted rational is pretextual. *See Martin*, 543 F.3d at 1268; *see also Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).

Even assuming Urban can establish a prima facie case of retaliation, C2 points to a legitimate, nonretaliatory reason for his termination. *See Martin*, 543, F.3d at 1268. Of course, once C2 provides a neutral reason, the burden shifts back to Urban, who must prove C2's stated reason is pretextual. *See Hurlbert*, 439 F.3d at 1297. Let's start with C2's reason for Urban's termination: C2 determined that eight of Urban's Facebook posts were "racially charged" and violated C2's non-harassment and social media policies. (Doc. 41 at 12; Doc. 39-1 at 298–305, 345.) Take just one example. Urban reposted a picture of a fishing line tied in the shape of a noose around the time the national news stories reported that Bubba Wallace perceived a noose in his NASCAR stall. (*Id.* at 300.) The image included a caption, written by Urban, stating, "I was gonna go fishing this evening [,] but I opened my tackle box and found this. Somebody's put this in there and I don't think it's funny at all." (*Id.*) C2's reason, thus, is a neutral one for terminating Urban.

In the light of the above, the burden shifts back to Urban to "show that the employer's proffered reason was pretextual." *Martin*, 543 F.3d at 1268. An "employer may fire an employee for . . . a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns.*, 738 F.2d 1181, 1187 (11th Cir. 1984). Urban must present evidence "sufficient to permit

12

a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons." *Hurlbert*, 439 F.3d at 1298. To "avoid summary judgment," a plaintiff "must introduce significantly probative evidence" of pretext. *Clark*, 990 F.2d at 1228.

C2 states that it fired Urban for violating its non-harassment and social media policies. (Doc. 39-1 at 272.) The record supports that Urban engaged in social media activity that "trigger[ed] several employee complaints" and that C2 could rationally conclude violated its policies. (Doc. 45 at 6; Doc. 39-12; Doc. 39-1 at 345.) In his response, Urban argues that C2 was mistaken in its determination that his conduct violated their policies. Specifically, Urban contends that his Facebook posts did not violate C2's Non-Harassment policy because none of the posts fall under the prohibited conduct and the posts were not "based upon race." (Doc. 42 at 18.) These arguments miss the point. Whether C2 misapplied its Non-Harassment and Social Media polices when terminating Urban is irrelevant to the legal inquiry. Rather, once C2 provides a neutral reason for termination, the question is whether Urban's evidence would allow a reasonable factfinder to conclude that C2's reason for termination was not the real reason. *See Hurlbert*, 439 F.3d at 1298. This Court may not act as "a super-personnel department that reexamines" C2's business decisions. *Chapman*, 229 F.3d at 1030. Whether C2 was correct for terminating Urban because "employees . . . were offended by the posts" rather than harassed by the posts is not a question for this Court to determine. (Doc. 39-5 at 26.)

13

Thus, C2 is also entitled to summary judgment on Urban's FMLA retaliation claim.

## C. The FCRA Discrimination Claim Fails for the Same Reason as Urban's FMLA Retaliation Claim

FCRA discrimination claims are also evaluated under the *McDonnell Douglas* burden-shifting framework based on circumstantial evidence when there is an absence of direct or statistical evidence of discrimination. *See Greenberg v. BellSouth Telecomms, Inc.*, 498 F.3d 1258, 1263–64 (11th Cir. 2007). To establish a prima facie case of FCRA discrimination, an employee must show that he is disabled, he is a qualified individual, and he was subjected to unlawful discrimination because of his disability. *Id.* at 1263. If an employee establishes a prima facie case, then the burden shifts to the employer to provide a non-discriminatory reason for adverse employment action. *See Wascura v. City of S. Miami*, 257 F.3d 1238, 1242–43 (11th Cir. 2001). Last, if the employer meets its burden, then the employee must prove the stated reason is pretextual. *Id.*

Assuming Urban can establish a prima facie case of FCRA discrimination, as explained above, Urban fails to demonstrate that C2's stated neutral reason for his termination (i.e., his violation of the non-harassment and social media policies) was pretextual. Therefore, Urban's FCRA discrimination claim also fails for the same reason as his FMLA retaliation claim.

IV. CONCLUSION

Because Urban suffered no damages from any denial of FMLA leave, his FMLA interference claim fails. Further, Urban fails to provide sufficient evidence from which a reasonable jury could infer that C2's stated neutral reason for terminating him was pretext for FMLA retaliation or FCRA disability discrimination. Accordingly, the following is **ORDERED**:

1. C2's Motion for Summary Judgment is **GRANTED**. (Doc. 41.)
2. The Clerk is directed to enter judgment in C2's favor, to terminate any pending motions and deadlines, and to close this case.

**ORDERED** in Tampa, Florida on July 26, 2022.

*Kathryn Kimball Mizelle*
Kathryn Kimball Mizelle
United States District Judge

15